UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



FILED

JUN 08 2010

CLERK

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| IN RE DAKTRONICS, INC. SECURITIES LITIGATION | * * * * * * * * * | CIV 08-4176 MEMORANDUM OPINION AND ORDER |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Pending before the Court is a Motion to Dismiss, doc. 62, by defendants Daktronics, Inc.,
James B. Morgan and William R. Retterath ("Defendants"), seeking dismissal of the Amended
Consolidated Complaint for Violation of Federal Securities Laws, doc. 49. For the following
reasons, the motion will be granted.

## BACKGROUND

On February 27, 2009, the Court consolidated three purported class action lawsuits asserting
that the defendants violated federal securities laws by issuing materially false and misleading press
releases and failing to disclose material facts about the business of Daktronics. (Doc. 26.) A group
consisting of St. Louis Construction Laborers and the Urben Family was appointed as lead plaintiffs
("Plaintiffs") of the purported class in the consolidated actions. On April 13, 2009, Plaintiffs filed
the Amended Consolidated Complaint ("Complaint"). Subsequently, Defendants filed the pending
Motion to Dismiss. The facts are taken from the Complaint and Daktronics' SEC filings, press
releases and transcripts of conference calls submitted with Defendants' motion to dismiss, which
although not attached to the Complaint are referred to therein and are central to Plaintiffs' claims.

Plaintiffs do not dispute the contents of the documents and they do not object to Defendants' submission of the documents for the Court's consideration.[1]

Lead Plaintiffs represent a class of purchasers that bought common stock of Daktronics between November 15, 2006 and April 5, 2007 ("class period"). During the class period, defendant James Morgan was the President and Chief Executive Officer of Daktronics, and defendant William Retterath was its Chief Financial Officer and Treasurer. In the Complaint, Plaintiffs allege that Defendants committed securities fraud under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("the Exchange Act"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and that defendants James Morgan and William Retterath are liable as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Daktronics is a South Dakota corporation whose stock is publicly traded on NASDAQ. It designs, manufactures and markets electronic scoreboards, computer-programmable displays, and large screen video displays and control systems. Daktronics grew its net sales each year during the five-year period before the start of the class period, from $148,773,000 in fiscal year 2002 to $309,370,000 in fiscal year 2006. (Ex. 1, 2006 Annual Report at 2.) Its earnings per share increased over the same period. (*Id.* at 3.) On a quarter-over-quarter basis, Daktronics' net sales were "lumpy." (Complaint at ¶33.) The company's Annual Report for fiscal year 2006, filed a few months before the start of the class period, stated:

> Our financial performance may vary significantly from quarter to quarter, making it difficult to estimate future revenue. Our quarterly revenues and earnings have varied in the past and are likely to vary in the future. Contracts we enter into generally

---

[1]The Court may take judicial notice of SEC filings without converting a motion to dismiss to a motion for summary judgment. *See Fla. State Bd. of Admin. v. GreenTree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001); *In re K-Tel Int'l Sec. Litig.*, 300 F.3d 881, 889 (8th Cir. 2002); *see* Fed. R.Evid. 201. Likewise, the Court may examine documents that a defendant attaches to a motion to dismiss if the plaintiff's claims are based solely on the interpretation of the documents submitted and the parties do not dispute the actual contents of the documents. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Silver v. H & R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997) (district court could have properly considered complete statements reported in news articles and could have granted motion to dismiss rather than convert to motion for summary judgment).

stipulate customer-specific delivery terms and may have contract cycles of a year or more, which subjects them to many factors beyond our control. Furthermore, because significant portions of our operating costs are fixed, an unanticipated delay or cancellation of orders in backlog may have a significant negative impact on our quarterly operating results. Therefore, quarterly operating results may be subject to significant variations, and operating performance in one quarter may not be indicative of future performance.

(Ex. 1 at 13-14 of Form 10-K.) In its quarterly reports filed before and during the class period, Daktronics told investors "[o]ur net sales and profitability historically have fluctuated due to the impact of large product orders, . . . . we . . . have experienced fluctuations in operating results and expect that our future results of operations may be subject to similar fluctuations." (Ex. 2, 1st Q 10-Q at 16; Ex. 5, 2nd Q 10-Q at 17; Ex. 8, 3rd Q 10-Q at 18.)

Sports, commercial, and transportation are Daktronics' three business segments. The sports division generated approximately 55% of Daktronics' revenues during the class period, mainly from large arena projects, such as stadium scoreboards for professional and collegiate sports teams. The commercial segment was the second largest and the fastest growing segment, generating approximately 40% of Daktronics' revenues during the class period. The digital billboard business portion of the commercial segment was "not quite a third of that." (Ex. 4, Transcript at 9.) The controversy in this case involves Daktronics' digital billboard business. Digital billboards allow advertising companies to rotate images from several different advertisers throughout the day, enabling advertising agencies to generate six to ten times more revenue than traditional static billboards.

In 2006, the outdoor advertising industry as a whole was booming and, as a result, Daktronics had experienced increased demand from outdoor media companies for digital billboards. In order to handle the influx of new orders for digital billboards, a new manufacturing facility was opened by Daktronics in Sioux Falls, South Dakota. According to Plaintiffs, Defendants emphasized the possibility that Daktronics could capitalize on the digital billboard industry, and analysts who

followed Daktronics were keenly interested in obtaining information from Defendants regarding the company's growth in the digital billboard segment.

The demand from outdoor media customers for digital billboards was subject to various risk factors, including regulatory issues that could delay or prevent the display of digital billboards. Daktronics' 2006 Annual Report[2] stated that "[i]t is important to keep in mind that local sign codes are a constraint on the usage of electronic displays on billboards." (Ex. 1, 2006 Annual Report at 3.) The 2006 Annual Report also mentioned that "various laws and regulations, including zoning ordinances, restrict the installation of outdoor signs and displays, particularly in the commercial market. These regulations may impose greater restrictions on electronic displays. . . . These factors may prevent or inhibit us from selling products to prospective customers." (Ex. 1, Form 10-K at 10.) Daktronics indicates that the regulatory resistance to the installation of digital billboards in some communities was also otherwise publicly known.[3]

Plaintiffs claim that, despite their admitted knowledge that Daktronics' two largest digital billboard customers (Lamar and Clear Channel) were experiencing delays and setbacks as a result of regulatory constraints, Defendants regularly provided strong revenue and earnings guidance to investors and analysts. Plaintiffs point to the November 15, 2006 press release where Daktronics announced the company's financial results for the fiscal second quarter of 2007. For the quarter, Daktronics reported net sales of $123.5 million and earnings per share of $0.22. Commenting on the results, defendant Morgan stated:

> Our Sioux Falls facility is coming along nicely. We shipped our first display out of that plant in mid-October. The capacity of this facility will continue to be ramped

---

[2]The Annual Report was duly authorized on July 3, 2006, for the fiscal year ended April 29, 2006. (Ex. 1, Form 10-K at 58.)

[3]The two largest customers for Daktronics' digital billboard products were Lamar Advertising Company and Clear Channel Communications, Inc. (Complaint at ¶29), both of which are publicly held. In 2006, both Lamar and Clear Channel discussed in their respective SEC filings that government regulation of outdoor advertising could significantly restrict their ability to rebuild or replace existing billboards. (Ex. 14, 2006 Lamar Annual Report at 8-9, 12; Ex. 15, 2006 Clear Channel Annual Report at 22.)

up over the coming months as we add personnel and additional work shifts. **We are excited to have the Sioux Falls facility coming on line to help us respond to the anticipated continued growth of demand in the digital billboard marketplace.** We see workforce availability as a limiting factor to the growth rate in Brookings, and therefore we continue to evaluate opportunities to expand capacity outside of Brookings.

*　　*　　*　　*

. . . Our commercial market order bookings are now up over 75% year-to-date led by outdoor advertising opportunities.

(Complaint at ¶ 36; Ex. 3, 11/15/06 Press Release.) Plaintiffs assert that the bold-faced portion of Morgan's statement is false and misleading because billboard sales were not constrained by capacity limitations on the supply side, but rather by regulatory constraints, and Morgan should not have anticipated continued growth of demand in the digital billboard marketplace. Defendants point out that Morgan continued explaining that all three of Daktronics' business segments had performed well during the quarter:

Although most of the external attention to our business has been given to the outdoor advertising space where orders continue to outpace revenues, it is important to note that the orders in our sports markets are up more than 45% on a year to date basis over last fiscal year," Morgan continued. "Also, our transportation market had an excellent quarter for orders, and is showing greater potential. Revenues in transportation are up over 60% both for the quarter and year to date as compared to last year, although order growth remained below 10%.

(Ex. 3, 11/15/06 Press Release.)

During an analyst conference call on the same day, November 15, 2006, Retterath said that the biggest factor in Daktronics' growth projections was the expectation of future growth in the billboard market. (Complaint at ¶ 37.) Retterath also commented that: "[o]n a go-forward basis, I think that potentially that billboard - - the percent of the billboard business could increase from the levels in the first half of the year. " (*Id.*) Morgan and Retterath both mentioned that the Sioux Falls facility would begin production of billboards and would help diminish the capacity constraints previously limiting Daktronics' projected digital billboard growth. (*Id.*) Plaintiffs allege these statements were false and misleading because Defendants failed to disclose the "true facts" about

5

regulatory issues surrounding digital billboards. (Complaint at ¶ 40.) According to Plaintiff, the "true facts" were that Daktronics' two largest digital billboard customers were facing serious regulatory obstacles to digital billboards, and because of this Retterath and Morgan, contrary to what they said on November 15, 2006, did not really believe Daktronics would post increased order volume in the billboard market. (*Id.*) Plaintiffs assert that Daktronics common stock rose by more than 25% from $26.67 per share to $33.60 per share in response to the favorable, misleading statements about the billboard business . (Complaint ¶ 38.) Defendants point out that, during the analyst conference call on November 15, 2006, Morgan told analysts to keep success in the digital billboard segment in perspective:

> I think it is important – just again, to put that in perspective, certainly as we said earlier, the billboard niche is very exciting, and to see what's going on there and it's great for our industry. But our business overall, it's still a relatively small part of our overall business.

(Ex. 4, Transcript at 9.)

Also in the November 15, 2006, press release, Daktronics announced that it was projecting net sales of $103 million to $115 million, and earnings in the range of $0.12 to $.018 per share, for its fiscal 2007 third quarter. (Ex. 3, 11/15/06 Press Release at 2.) These numbers were lower than the net sales and earnings per share that Daktronics had reported during its fiscal second quarter. (*Id.*, reporting net sales of $123.5 million and earnings per share of $0.22 for fiscal 2007 second quarter.) In the analysts' conference call that day, Morgan commented on the results for its fiscal second quarter as compared to the lower projections for the fiscal third quarter:

> [O]ur business has – because we work with a lot of large projects, it is somewhat lumpy. And one quarter at Daktronics does not make a trend. And last quarter we actually missed our numbers by just a little bit. And I think just always concerned maybe there's a little over-reaction in the market.

(Ex. 4, Transcript at 13.)

On November 20, 2006, Daktronics filed its Form 10-Q for its fiscal 2007 second quarter (Ex. 5), which contained the results announced in the November 15, 2006, press release. Plaintiffs

assert that the following statements in the Form 10-Q are false and misleading: "This industry continues to increase its demand for video displays in place of traditional billboards due to enhanced margins and cash flow that they achieve;" and "We expect that the growth in the commercial market will continue throughout fiscal year 2007 due to increased order volume in the billboard market. . . ." (Complaint at ¶ 39.) Defendants note that increased billboard orders was only one of six different factors the company said it expected to cause growth in the commercial market. The full paragraph in the Form 10-Q for fiscal 2007 reads:

> We expect that the growth in the commercial market will continue throughout fiscal year 2007 due to increased order volume in the billboard market, our expanded distribution network, greater product acceptance, our international expansion, the development of our resellers and our integrated product offerings. Net sales in the commercial market should also expand at rates faster than our other markets, and our national account business and billboard business within the commercial market could grow faster depending on our success in booking major accounts in this niche. We also expect to see growth generated through sales of our new ProTour line of mobile and modular displays, which we believe will drive improvements in profitability internationally.

(Ex. 5, 2nd Q 10-Q at 21.) According to Plaintiffs, Defendants also falsely stated in the Form 10-Q that sales during the second quarter of fiscal year 2007 were limited as a result of capacity constraints within the company's manufacturing facilities. (Complaint at ¶ 39.)

In a press release issued on February 14, 2007, Daktronics announced results for its fiscal 2007 third quarter. (Ex. 6.) Daktronics had met its net sales projection originally announced in the November 15, 2006, press release, and reported net sales of $106.7 million and earnings of $0.10 per share. Daktronics noted that new orders were down in the quarter. Morgan explained that there was a "reduction in backlog" because "our ratio of orders to sales was less than expected, which we attribute to lower than expected orders in professional baseball and in the billboard niche." (Ex. 6, 2/14/07 Press Release.) According to Plaintiffs, defendant Morgan made the following false statements in the press release:

> We are very pleased with our top and bottom line performance for the quarter . . . .
> We hit the mid-point of our revenue projection range, and gross profit margins

exceeded 30%. With the reduction in backlog, we will be looking for strong order bookings in Q4 . . . .

*      *      *      *

[W]e are expecting orders in billboards and large sports venues, along with the other areas of our business, to be strong in the fourth quarter of fiscal 2007, allowing for a strong start for the new fiscal year.

(Complaint at ¶ 41.) Plaintiffs fault Defendants for again failing to fully disclose the regulatory problems with digital billboards in the February 14, 2007, press release and instead claiming that the billboard segment would grow. Plaintiffs also allege Morgan falsely stated that Daktronics remained "well positioned" to post 4Q07 "earnings in the range of $0.12 to $0.19 per share." (Complaint at ¶ 42.).

In a conference call with analysts following the February 14, 2007, press release, Morgan said that "orders for digital billboards were down for the quarter." (Exhibit 7, Transcript at 2.) He did not see that as a "trend," and he stated:

> There remains a lot of excitement about the use of digital billboards. I would like to comment, however, that as we have always stated, there are constraints on the rate of application for the digital billboards. One of the primary constraints i[s] the regulatory environment in some municipalities. In some cases, these regulations slow the process of installing digital and in some cases they prohibit the installation. This again varies from city to city and is important that investors understand that this constraint exists to balance the picture in light of the potential growth that exists.

(Complaint at ¶ 43; Exhibit 7, Transcript at 2.) Plaintiffs allege that this was the first time Defendants admitted the existence of regulatory constraints on the digital market and that digital billboard orders were down for the quarter.[4] (Complaint at ¶ 43.)

Here is what Morgan said in regard to continued growth of billboard orders during the analyst conference call on February 14, 2007:

---

[4]Defendants again point out that the regulatory issues and risks affecting the digital billboard business appeared in Daktronics' 2006 Annual Report.

There's a – we do have a couple larger customers in digital billboards, and certainly how they decide to schedule their demand is – has a big impact on what we see there. So that's – it can be heavily influenced by a couple customers in that case. We don't see it as a trend. It's just a matter of – I think the unknown here is how fast it can really grow. As I mentioned, there's the constraint of the regulation I think there's also the reality of there's some limit to the capacity for the digital billboard companies just internally and operationally to deploy these. It takes a finite amount of planning and manpower and effort to make this happen, so – and it's relatively new to the billboard company. So I think how fast they can and will ramp up is still to be determined.

*    *    *    *

I'd say there is uncertainty in how fast this will grow, in terms of our comfort. I don't know that we can predict that. What we've done is put ourself in a position to be able to respond . . . to the demand and continue to be a reliable supplier. So, beyond that for us to predict how fast our customers are going to want to deploy these, that's rather difficult for us to do. I mean we expect it to continue to grow, but the rate of growth is hard to nail down.

(Ex. 7, Transcript at 5.)

Looking forward, Daktronics announced that it was projecting net sales of $106 million to $118 million, and earnings of $0.12 to $0.19 per share, for its fiscal 2007 fourth quarter. (Ex. 6, 2/14/07 Press Release.) After the February 14, 2007, press release, Daktronics' stock price fell by $8 per share, or about 21%. (Complaint at ¶46.)

Daktronics' Form 10-Q for the fiscal 2007 third quarter (Ex. 8), filed on February 23, 2007, (1) reported the same results as the 2/14/07 press release, (2) incorporated the "Risk Factors" section of Daktronics' Annual Report (Ex. 8 at 2), (3) contained additional discussion that regulatory constraints affect "the sign business overall", and affect digital displays "to a greater degree" (Compl. ¶47), and (4) stated that Daktronics expected growth in the commercial segment to continue in fiscal 2007 due to the same six factors that had been discussed in Daktronics' second quarter Form 10-Q, including increased order volume in the billboard market. (Ex. 8, 3rd Q Form 10-Q at 21.) According to Plaintiffs, Defendants did not really expect growth in the billboard market because they knew some cities and states were refusing to allow outdoor advertisers to install digital billboards,

so Defendants had included revenue for its fiscal 2007 fourth quarter projections from orders that they knew could not be completed and which would render Daktronics unable to meet its fourth quarter earnings per share projections. (Complaint at ¶ 48.)

On April 5, 2007, two months into its fiscal 2007 fourth quarter, Daktronics issued a press release (Ex. 9) announcing lower projections of net sales and earnings for that quarter.[5] The revised projections called for net sales of $101 million to $105 million and earnings of $0.06 to $0.10 per share during the fiscal fourth quarter. Morgan explained that "we were unable to book enough orders earlier in the quarter to generate the sales, which is causing this revision in estimates." Morgan attributed the level of order bookings "to the natural volatility of our large display business." (Ex. 9, 4/5/07 Press Release.) In a conference call with analysts that followed the press release, Morgan further explained that "orders for the quarter will be slightly less than anticipated, but perhaps more so the timing of the orders in the quarter is heavily weighted to the third month, which doesn't allow us to generate much revenue [for the quarter] on those orders." (Ex. 10, Transcript at 1.) Daktronics' stock price fell $5.78 per share, or about 20%, upon the April 5, 2007 announcement. (Complaint at ¶49), giving rise to this lawsuit alleging violations of federal securities laws.

> Plaintiffs' allegations of securities fraud are summarized in the Complaint as:
>
> At least by the start of the Class Period, defendants were well aware, but failed to disclose, that: (I) there was significant regulatory resistance to the concept of digital billboards, which had significantly delayed the roll out of the new technology; (ii) even municipalities that indicated that they would ultimately approve digital billboard technology were requiring significant time to amend and update their billboard regulations, including extensive multi-month studies of the issues, before the technology would be allowed; (iii) because of these ongoing problems and delays associated with digital billboard conversion, defendants were aware that Daktronics' customers would not be able to significantly increase their digital billboard sales at levels that defendants had incorporated into Daktronics' second-half 2007 EPS numbers; and (iv) as a result of these uncertainties regarding the near-term growth

---

[5] As it turned out, Daktronics was able to achieve the net sales it originally had projected for the fiscal 2007 fourth quarter. (Ex. 11, 5/30/07 Press Release) (announcing net sales of $110.8 million and earnings per share of $0.09 for the quarter). Daktronics also booked a record level of digital billboard orders in the fourth quarter. (*Id.*)

of Daktronics' digital billboard revenues and sales, defendants had no reasonable basis to believe, and did not in fact believe, that the guidance that they provided for 4Q07 or fiscal 2007, which provided for a consistent 30% growth in quarter to quarter digital billboard sales, was attainable.

(Complaint at ¶ 54.)

Plaintiffs state two causes of action. The first claim for relief is for violation of § 10(b) of the Exchange Act and Rule 10b-5 against each Defendant, alleging that Defendants carried out a scheme and wrongful course of conduct to deceive the investing public by concealing material information and making false statements, which they knew or recklessly disregarded were materially false and misleading. (Complaint ¶¶ 68-76.) Plaintiffs contend they, and the class they seek to represent, suffered damages by paying artificially inflated prices for Daktronics stock. (*Id.* at ¶ 74.) The second claim for relief is for violation of § 20(a) of the Exchange Act against defendants Retterath and Morgan. (Complaint ¶¶ 77-82.) Plaintiffs allege Retterath and Morgan acted as controlling persons of Daktronics, subjecting them to liability under § 20(a) of the Exchange Act. (*Id.*)

Defendants contend in their motion to dismiss that the Complaint fails to meet the pleading standards set forth under the Private Securities Litigation Reform Act of 1995 ("the Reform Act" or "PSLRA"), 15 U.S.C. §§ 78u-4 and 78u-5, and Fed.R.Civ.P. 9(b)[6]. Specifically, Defendants contend that Plaintiffs: 1) have failed to identify the statements alleged to have been false; 2) have failed to allege facts showing the statements were false when made; and 3) have not alleged facts sufficient to create a strong inference that each defendant acted with scienter. Defendants further assert that their statements are protected by the PSLRA's safe harbor for "forward-looking statements." They also argue that the control-person claims under § 20(a) of the Exchange Act must be dismissed.

---

[6]The Eighth Circuit has held that investors bringing securities fraud actions "technically do not need to meet the requirements of *both* Federal Rules of Civil Procedure 9(b) and the [Reform Act], as the [Reform Act] supercedes reliance on 9(b) in securities fraud cases and embodies the standards of 9(b)." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 742 (8th Cir. 2002).

Plaintiffs disagree and contend that the Complaint meets the pleading requirements imposed by the Reform Act. Moreover, Plaintiffs assert the Complaint meets the pleading requirements to proceed on its controlling-persons claim pursuant to Section 20(a) of the Exchange Act.

## DISCUSSION

Although the Court must assume all factual allegations in the complaint are true in deciding the pending motion to dismiss, "under the Reform Act we disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute." *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001) (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999)) ("*Green Tree*"). A plaintiff is entitled to all reasonable inferences that may be drawn from the allegations of the complaint under Federal Rule of Civil Procedure 12(b)(6). However:

> [U]nder the Reform Act, a securities fraud case cannot survive unless its allegations collectively add up to a strong inference of the required state of mind. "Congress has effectively mandated a special standard for measuring whether allegations of scienter survive a motion to dismiss. While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable .... Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences."

*Green Tree*, 270 F.3d at 660 (quoting *Greebel v. TFTP Software, Inc.*, 194 F.3d 185, 195-96 (1st Cir. 1999)).

The Exchange Act was enacted "in order to promote full disclosure and thereby protect investors against manipulation of stock prices." *Alpern v. Utilicorp United, Inc.*, 84 F.3d 1525, 1533 (8th Cir. 1996); 15 U.S.C. § 78j. Section 10(b) of the Exchange Act specifically prohibits the use of any "manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b).

Rule 10b-5, promulgated by the SEC under the Exchange Act, provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. The Eighth Circuit explained that "[s]tanding under § 10(b) and Rule 10b-5 requires a showing of (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit; (2) causation, often analyzed in terms of materiality and reliance; (3) damages; and (4) fraudulent activity occurring in connection with the purchase and sale of a security." *Alpern*, 84 F.3d at 1533-34. While scienter is not explicitly mentioned in the statutory text, it is an essential element of a § 10b-5 or Rule 10b-5 claim. *See id.* at 1534.

In private securities litigation, there are two heightened pleading requirements. "'The first requires that the complaint specify each false statement or misleading omission and explain why the omission was misleading.'"[7] *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741-742 (8th Cir. 2002)

---

[7]The first pleading requirement is provided in 15 U.S.C. § 78u-4(b)(1):

**(b) Requirements for securities fraud actions**
  **(1) Misleading statements and omissions**
  In any private action arising under this chapter in which the plaintiff alleges that the defendant –
    **(A)** made an untrue statement of a material fact; or
    **(B)** omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
  the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(quoting *Green Tree*, 270 F.3d at 654). The second requirement is that "'the complaint [must] state "with particularity" facts giving rise to a "strong inference" that the defendant acted with the scienter required for the cause of action.'"[8] *Id.* at 742 (quoting *Green Tree*, 270 F.3d at 654). In determining whether the plaintiff has alleged facts giving rise to the required "strong inference" of scienter,

> a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.... [T]he inference of scienter must be more than merely "reasonable" or "permissible"-it must be cogent and compelling, thus strong in the light of other explanations. A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The Eighth Circuit has defined scienter as "'the intent to deceive, manipulate, or defraud.'" *Green Tree*, 270 F.3d at 653 (quoting *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 320 (8th Cir. 1997)). In the Eighth Circuit, recklessness satisfies the Rule 10b-5 scienter requirement. Recklessness, as defined in the Eighth Circuit, is:

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Green Tree*, 270 F.3d at 654 (quoting *Camp v. Dema*, 948 F.2d 455, 461 (8th Cir. 1991)).

---

[8]The second heightened pleading requirement is provided in 15 U.S.C. § 78u-4(b)(2):

**(b) Requirements for securities fraud actions**
    **(2) Required state of mind**
    In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

The Court must dismiss a complaint that does not meet the requirements for securities fraud actions set forth in sections 78u-4(b)(1) & (2). *See* 15 U.S.C. § 78u-4(b)(3)(A).

In the instant case, Defendants contend that Plaintiffs have failed to adequately plead: (1) actionable misrepresentations or omissions of material facts; and (2) that Defendants acted with scienter. In support of their assertion that Plaintiffs failed to plead with sufficient particularity that Defendants made fraudulent misrepresentations or omissions, Defendants assert that their public statements quoted in the Complaint were true, or they were forward-looking statements, or they were so vague as to be immaterial. In support of their contention that Plaintiffs failed to plead scienter, Defendants maintain that the Complaint only pleads that the "defendants knew generally of certain regulatory risks - - risks that were open and notorious in the marketplace - - that might affect orders for digital billboards." (Doc. 63 at 3.)

## I. First Pleading Requirement: Allegations of Material Misstatements and Omissions

The Complaint contains short excerpts from Daktronics' public statements and identifies the allegedly false and misleading portions of those statements in bold and italics. The Complaint then explains why each of the highlighted statements was false and misleading by providing a list of "true facts" that were known to defendants at the time they made the statements, which Plaintiffs believe rendered the statements false and misleading. (Complaint at ¶ 48.) Thus the Court finds Plaintiffs have identified the statements alleged to have been false.

Next, the Court must examine whether Plaintiffs have pled with sufficient particularity the falsity of the statements identified in the Complaint.[9] The first group of challenged statements involves the defendants' statements about future growth of the digital billboard market. These

---

[9]Defendants argue that Plaintiffs' allegations fail under the PSLRA because there are no sources providing support for the claims that Defendants' statements or numbers were false. This argument is misplaced. In contrast to cases relying on company insiders, employees or other witnesses to support allegations of fraud, Plaintiffs in this case rely on public information. As discussed in this Opinion, Plaintiffs rely on Defendants' SEC filings, press releases and conference calls with analysts.

appeared in the November 15, 2006 press release ("anticipated continued growth of demand in the digital billboard marketplace"); the November 15, 2006 analyst conference call ("expectations of future growth in the billboard market"); the 2Q 07 Form 10-Q filed on November 20, 2006 ("[w]e expect that the growth in the commercial market will continue throughout fiscal year 2007 due to increased order volume in the billboard market"); the February 14, 2007 press release ("we are expecting orders in billboards . . .to be strong in the fourth quarter"); and the 3Q 07 Form 10-Q filed February 23, 2007 (the company "expect[s] that the growth in the commercial market will continue through fiscal year 2007 due to increased order volume in the billboard market"). The second group of challenged statements involves Defendants' projections of earnings per share for its fiscal 2007 fourth quarter (Daktronics remained "well positioned" to post fourth quarter 2007 "earnings in the range of $0.12 to $0.19 per share").

The final group is better characterized as omissions: Plaintiffs fault Defendants for failing to discuss the significant regulatory obstacles facing its two largest billboard customers. Plaintiffs allege that Defendants' other statements about the expected growth of the billboard market and projected earnings per share, as listed above and in the Complaint, were misleading absent the disclosure of material information about the negative impact of regulatory obstacles. The Court will address the claimed omissions first because those are the core of Plaintiffs' other allegations of securities fraud.

A. Omissions

1. Duty to Disclose

"Before liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure." *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 831 (8th Cir. 2003). "'[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects.'" *In re K-tel Intern., Inc. Securities Litigation*, 300 F.3d 881, 898 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001)). Plaintiffs assert that Defendants' decision to speak about the growth of the digital billboard business gave rise to a duty to fully disclose the regulatory problems faced by its

two biggest billboard customers. Defendants do not dispute that the law requires disclosure to be complete and accurate,[10] but Defendants argue that Plaintiffs have failed to plead a factual basis for this claim because Plaintiffs: 1) fail to allege specific facts indicating what the regulatory obstacles were, what Defendants knew about them, when they knew it, and how that knowledge or information would have undermined the accuracy of Defendants' public statements, and 2) fail to provide sources for the allegations.

Plaintiffs rely heavily on the Sixth Circuit's decision in *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) (en banc) (recognized as overruled in part on other grounds in *Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008)). The Sixth Circuit in *Helwig* held that the plaintiff had properly stated a claim for securities fraud when the "defendants projected financial well-being . . . while knowingly omitting material facts that would have tempered their optimism." *Id.* at 544. *Helwig* is distinguishable from the present case. The defendants in *Helwig* publicly stated that they were comfortable with earnings estimates made prior to the passage of the Balanced Budget Act, despite knowledge that the Act, if passed, would have detrimental effects on the company's viability. Simultaneously, the defendant company circulated an internal memorandum detailing the potential impact of the legislation, and then warned its employees of impending hard times, including lay-offs, that would result from financial difficulties expected from passage of the Act.

The allegations of internal research and reports about the Balanced Budget Act and its potential negative impact that gave rise to a duty to disclose in *Helwig* are not present here. Plaintiffs allege that there was significant regulatory resistance to the concept of digital billboards and that some municipalities were requiring significant time to amend and update their billboard

---

[10]Defendants assert that the disclosure was complete and accurate, pointing to the statements made in Daktronics' 2006 Annual Report which stated, "[i]t is important to keep in mind that local sign codes are a constraint on the usage of electronic displays on billboards." (Ex. 1, 2006 Annual Report at 3.) The Form 10-K attached to the 2006 Annual Report also disclosed that "various laws and regulations, including zoning ordinances, restrict the installation of outdoor signs and displays, particularly in the commercial market. These regulations may impose greater restrictions on electronic displays. . . . These factors may prevent or inhibit us from selling products to prospective customers." (Ex. 1, Form 10-K at 10.)

regulations, but Plaintiffs do not allege facts about the specific regulatory obstacles faced by Lamar and Clear Channel, what Defendants knew about them, when they knew it, and how that knowledge or information would have undermined the accuracy of Defendants' public statements about expected growth in demand for digital billboards or about its fourth quarter earnings estimate. The PSLRA requires allegations of "facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made." *Navarre*, 299 F.3d at 742. Defendants warned the market that electronic billboard regulations may prevent or inhibit sales of billboards, but there is no evidence Defendants anticipated that the billboard regulations would in fact lead to fewer billboard orders and that they somehow tried to hide that information from investors. Other than Plaintiffs' blanket statements, the Complaint is devoid of any indication that regulatory issues faced by Lamar and Clear Channel had any impact on Daktronics' billboard orders. In fact, Daktronics was able "to book a record level of orders in the digital billboard niche" in the fourth quarter of fiscal 2007. (Ex. 11, 5/30/07 Press Release.) The Court finds that there was no duty to disclose the specific regulatory obstacles facing Daktronics' two biggest digital billboard customers. *See, e.g.*, *In re Sofamor Danek Group, Inc.*, 123 F.3d 394 (6th Cir. 1997) (once company disclosed FDA warning that it would face regulatory action if it marketed device for a prohibited use, company had no further duty to disclose predictions regarding future regulatory actions or losses the company would suffer as a result). *See also Kushner*, 317 F.3d at 831 ("[T]here is no duty to disclose 'soft information,' such as a matter of opinion, predictions, or a belief as to the legality of the company's own actions. Soft information must be disclosed only if virtually as certain as hard facts.")

### 2. Materiality

Even if Daktronics had a duty to disclose the specific regulatory issues facing Lamar and Clear Channel, the Court finds it was not a material omission as a matter of law. The anti-fraud provisions of the Exchange Act include an element of materiality. *See Parnes v. Gateway, 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) ("To present a cognizable claim for securities fraud, a plaintiff must allege that a defendant made misrepresentations that were material.") "A fact is material if it is substantially likely that the disclosure of the omitted fact would have been viewed

by the reasonable investor as having significantly altered the 'total mix' of information made available." *K-tel*, 300 F.3d at 897 (internal quotations omitted). As this inquiry "requires delicate assessments of inferences a reasonable investor would draw from a given set of facts," materiality is ordinarily a question of fact for the jury. *In re Control Data Corp. Sec. Litig.*, 933 F.2d 616, 621 (8th Cir. 1991) (citation omitted). However, "where a reasonable investor could not have been swayed by an alleged misrepresentation, a court may determine, as a matter of law, that the alleged misrepresentation is immaterial." *Parnes*, 122 F.3d at 546. Alleged misrepresentations can be immaterial as a matter of law if they: 1) are of such common knowledge that a reasonable investor can be presumed to understand them; 2) present or conceal such insignificant data that, in the total mix of information, it simply would not matter; 3) are so vague and of such obvious hyperbole that no reasonable investor would rely upon them; or 4) are accompanied by sufficient cautionary statements. *Id.* at 546-48.

As early as July 2006, in Daktronics' 2006 Annual Report, the company issued the following cautionary statement about government and other regulations:

> In the United States and other countries, various flaws and regulations, including zoning ordinances, restrict the installation of outdoor signs and displays, particularly in the commercial market. These regulations may impose greater restrictions on electronic displays due to alleged concerns over aesthetics or driver safety if a "moving" display is located near a road or highway. These factors may prevent or inhibit us from selling products to some prospective customers.

(Ex. 1, Form 10-K at 10.) Also, in the February 14, 2007, analyst conference call, defendant Morgan warned of the constraints on the digital billboard business, "One of the primary constraints i[s] the regulatory environment in some municipalities. In some cases, these regulations slow the process of installing digital and in some cases they prohibit the installation." (Complaint at ¶ 43; Ex. 7, Transcript at 2.) In light of these cautionary statements by Defendants, the omission of information regarding the specific regulatory challenges faced by Lamar and Clear Channel was not material when Defendants opined that digital billboard orders would increase and when they made their 2007 earnings per share projections. *See, e.g., Parnes*, 122 F.3d at 548 (cautionary language which relates

directly to that which the plaintiffs claim to have been misled, if sufficient, renders the alleged misrepresentation or omission immaterial as a matter of law).

B. Misleading Statements

1. Falsity

Plaintiffs allege that favorable statements made about future growth of the digital billboard industry and earnings per share projections for fourth quarter and fiscal 2007 were materially false and misleading because Defendants failed to disclose the regulatory problems encountered by Daktronics' two biggest billboard customers. The inquiry is whether in light of what was omitted (regulatory issues faced by Lamar and Clear Channel), what was said was misleading. The Court agrees with Defendants that the Eighth Circuit's decision in *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079 (8th Cir. 2005), is instructive on this issue. The complaint in *Cerner* alleged that the defendants' favorable statements regarding future earnings were materially false and misleading because the company was losing deals due to increased competition, dissatisfied customers, a general economic downturn, an inexperienced sales force, and a neglect of smaller deals. Affirming the district court's dismissal of the complaint, the Eighth Circuit held:

> The complaint is devoid, however, of any indication that this alleged loss of deals, even if "material," is necessarily inconsistent with Cerner's statements that its demand was "strong." A company could conceivably lose a material number of deals it had pursued, and yet continue to see a strong demand for its products and substantial future opportunities. Furthermore, there is no indication on the face of the complaint that even a material loss of deals necessarily rendered Cerner unable to achieve its projected earnings. Finally, and perhaps most importantly, the complaint does not identify a single specific deal that was lost due to alleged changes in Cerner's corporate structure and strategies. Without any indication that an undefined loss of sales necessarily would affect the company's overall demand or its ability to meet its future earnings projections, these allegations cannot survive the Reform Act's falsity standard.

*Cerner*, 425 F.3d at 1084.

In the present case, the allegations in the Complaint shed no light as to whether Defendants were wrong about the potential growth of the digital billboard market or whether the earnings per

share projections for Daktronics' fourth quarter and fiscal year 2007 were unattainable as a result of the regulation of digital billboards by cities and states.[11] The Complaint generally describes regulatory hurdles to placement of digital billboards, but Plaintiffs do not point to a decrease in demand for digital billboards that would have caused the statements regarding potential growth in demand to be false when made, nor do they identify how a downturn in the digital billboard market would have required a modification of Daktronics' projected growth and earnings for the fourth quarter 2007.[12] Plaintiffs simply rely on the fact that two of Daktronics' largest digital billboard customers were facing regulatory challenges. They fail to indicate how this equates with the conclusion that Defendants had no basis for their projections. Defendants did not hide the fact that regulatory issues can affect sales of digital billboards, but the Complaint does not identify any billboard orders that were expected by Daktronics and fell through due to regulatory obstacles, the dollar value of those orders, or when Defendants learned those orders would not be received. Even if there had been a slow down of digital billboard sales due to regulatory issues faced by Lamar and Clear Channel, Plaintiffs do not assert why Defendants reasonably should have expected it to materially impact Daktronics' projected earnings. Plaintiffs rely entirely upon speculation and conjecture in concluding that Daktronics' fourth quarter 2007 earnings per share were affected by lost sales due to billboard regulations faced by Lamar and Clear Channel.

Even if the regulatory issues facing Lamar and Clear Channel were material and should have been disclosed, Plaintiffs do not demonstrate with particularity how the challenged statements regarding growth of the billboard industry and financial projections for the fourth quarter earnings per share were false or misleading at the time the statements were made. *In re Navarre*, 299 F.3d at 743 ("Simply alleging that defendants made a particular statement at a given time. . . and then

---

[11] In fact, Daktronics met its net sales projections in both the fiscal 2007 third quarter and the fiscal 2007 fourth quarter, and booked a record level of digital billboard orders during the fiscal 2007 fourth quarter.

[12] The commercial segment of Daktronics' business generated approximately 40% of the company's revenues during the class period, and the digital billboard business portion of the commercial segment was not quite a third of that.

showing in hindsight that the statement is false misses the [Reform Act's] pleading requirement.")
Therefore, Plaintiffs have not pled with particularity the falsity of Defendants' revenue and earnings
projections for fourth quarter 2007 and fiscal 2007, and dismissal of Plaintiffs' § 10(b) and Rule
10b-5 claims is warranted. *See Elam v. Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008) (affirming
dismissal where the pleading "fails to point to any contemporaneous reports, witness statements, or
any information that had actually been provided to defendants" that indicated defendants' projections
were false when made).

### 2. Materiality

Furthermore, the Court finds Defendants' statements about expected growth in demand for
digital billboards, even if false or misleading, are the type of vague, hyperbolic statements that are
immaterial as a matter of law. *See, e.g., Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th
Cir.1997) (statements that constitute puffery, "statements [that] are so vague and such obvious
hyperbole that no reasonable investor would rely upon them," are not actionable). "[S]oft, puffing
statements generally lack materiality because the market price of a share is not inflated by vague
statements predicting growth. No reasonable investor would rely on these statements, and they are
certainly not specific enough to perpetrate a fraud on the market." *Id.* (citation omitted).

The statements identified by Plaintiffs clearly are general optimistic statements about growth,
and Plaintiffs do not argue otherwise. Plaintiffs' argument is that the statements must be material
because Daktronics' stock fell 20% the day Defendants announced the revised projections on April
5, 2007. Daktronics points out that the projections were lowered on April 5 because orders were
expected to be received late in the quarter, thereby making it difficult for Daktronics to generate
revenues for the quarter from those orders. (Ex. 9, 4/5/07 Press Release.) What is important to the
materiality inquiry is what Defendants said in the statements challenged by Plaintiffs, not what
happened to the price of Daktronics' stock. And what Defendants said is that they "anticipated" and
"expected" continued growth of demand in the digital billboard marketplace. (Complaint at pp 36,
37, 39, 41,47.) This is simply too vague to be considered material. *See Parnes*, 122 F.3d at 547

(finding statement that company expected "significant growth" in the future too vague to be material).

## II. Second Pleading Requirement: Allegations of Scienter

Even if Plaintiffs' allegations of securities fraud satisfied the PSLRA's particularity requirement for false or misleading statements or omissions, Plaintiffs nonetheless fail to sufficiently plead scienter. Scienter "can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) (internal citations omitted). In order to survive a motion to dismiss, a plaintiff's allegations must "give rise to a strong inference of scienter," meaning that the inference "must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* (quoting *Tellabs*, 551 U.S. at 314.)

Plaintiffs in the present case rely on the recklessness standard to establish scienter. Where scienter is based on reckless conduct, "[s]uch sufficient conduct is limited to 'highly unreasonable omissions or misrepresentations' involving 'an extreme departure from the standards of ordinary care, and ... present[ing] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *K-tel*, 300 F.3d at 893-94 (alterations in original) (internal citations omitted). Without a showing of motive and opportunity, the remaining allegations against the defendants must be particularly strong to constitute an inference of recklessness. *Id.* at 894.

The Eighth Circuit has stated that "[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Green Tree*, 270 F.3d at 665. Furthermore, officers are responsible for facts reasonably available to them, particularly when the facts are critical to a business' core operation or an important transaction. *See In re K-tel Int'l*, 300 F.3d at 891.

Plaintiffs rely on the following allegations to establish that Defendants acted recklessly by providing the fourth quarter and fiscal 2007 projections: 1) Defendants knew Daktronics' two largest digital billboard customers, Lamar and Clear Channel Outdoor, were facing serious regulatory obstacles in attempting to convert their billboards from static to digital; 2) Defendants understood that municipalities throughout the United States, including St. Paul and Bloomington, Minnesota and Des Moines, Iowa were commissioning their own safety studies prior to allowing the installation of digital billboards, which was also delaying Lamar's and Clear Channel Outdoor's installation of digital billboards; and 3) Defendants were aware that Lamar and Clear Channel Outdoor were similarly encountering stiff resistance in connection with their efforts to lobby government regulators to approve digital billboards. According to Plaintiffs, all of this information, which was known to Defendants at the time they made their class period statements, must have at least suggested to Defendants that their fourth quarter and fiscal 2007 guidance was not accurate.

These allegations are insufficient to establish that Defendants' statements about the expected future growth of the digital billboard market and their earnings per share projections for fiscal 2007 were materially inaccurate, involving "an extreme departure from the standards of ordinary care," and presenting a known or obvious danger of misleading buyers or sellers. Plaintiffs have failed to meet their heightened burden of establishing that any inference of scienter from their allegations is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Elam*, 544 F.3d at 928.

### III.   Safe Harbor for Forward-Looking Statements with Cautionary Language

Congress limited liability for forward-looking statements by including a "safe harbor" provision in the PSLRA. *See* 15 U.S.C. § 78u-5(c)(1) and (2). Forward-looking statements are not actionable if they are identified and accompanied by risk disclosures, if they are immaterial, or if the plaintiffs fail to prove that the person or persons making the statements made it with actual knowledge that the statement was false or misleading. *See* 15 U.S.C. § 78u-5(c)(1)(A). Defendants assert that, even if the Court had determined that Plaintiffs' Complaint alleges sufficient facts to support inferences of falsity and scienter, the statements about expected demand in the billboard

market and Daktronics' projections of quarterly earnings per share would still be protected by the statutory safe harbor as forward-looking statements accompanied by meaningful cautionary language. Plaintiffs do not dispute that the challenged statements are forward-looking, and they do not deny that the statements were accompanied by cautionary language. Plaintiffs challenge the sufficiency of the cautionary statements and argue that Defendants had actual knowledge the projections were false. Upon close review of Plaintiffs' allegations in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have not stated with particularity facts giving rise to any inference that Defendants had actual knowledge the projections were false. Thus, the Court will limit its "safe harbor" inquiry to the adequacy of the meaningful cautionary statements.

"The requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland Securities Corp.* v. *INSpire Ins. Solutions, Inc.* 365 F.3d 353, 372 (5th Cir. 2004) (citing H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 31, 44 (1995)); *see also Helwig*, 251 F.3d at 559 ("[C]autionary statements must be substantive and tailored to the specific future projections, estimates, or opinions . . . which the plaintiffs challenge."). Here, Defendants argue that they meaningfully disclosed the risks specific to Daktronics' business: lumpy sales due to the difficulty in predicting the timing of large orders, and regulatory obstacles to digital billboard sales. Specifically, Defendants argue that meaningful cautionary language was presented in the following manner:

> Daktronics' SEC filings before and during the class period repeatedly warned investors that Daktronics' "financial performance may vary significantly from quarter to quarter" (Ex. 1), that Daktronics' historically had experienced fluctuations in net sales and profitability due to the impact of large orders (Exs. 2, 5, 8), and that Daktronics expected "that our future results of operations may be subject to similar fluctuations" (id.). The warnings in Daktronics' SEC filings were incorporated expressly and by reference into Daktronics' 11/15/06 and 2/14/07 press releases and into the statements made by defendants during the conference calls with analysts, which is adequate to invoke the PSLRA's safe harbor provision. NVE Corp., 551 F. Supp. 2d at 892-893; Yellen v. Hake, 437 F. Supp. 2d 941, 963-964 (S.D. Iowa 2006) (collecting cases so holding). Morgan repeated these warnings in the 11/15/06 conference call with analysts at the start of the class period ("[O]ur business . . . is

somewhat lumpy. And one quarter at Daktronics does not make a trend.") (Ex. 4, Transcript at 13).

(Doc. 63, Defendants' Memorandum at 27.) Defendants do not even attempt to argue that the language contains any information as to how sales of digital billboards might be impeded by government regulations. The disclosures identified above were not specific enough to offer safe harbor protection of Defendants' challenged statements because they did not provide warnings relating to the regulatory constraints on the rollout of digital billboards. Cautionary language must be more extensive and specific to be meaningful.

Defendants also argue the following in support of safe harbor protection:

> Notably, in Daktronics' 2006 Annual Report filed before the start of the class period, and during the 2/14/07 conference call with analysts during the class period, defendants warned about the specific risks that the Complaint (mistakenly) alleges were not disclosed until the end of the class period. The Annual Report discussed various regulatory factors that "may prevent or inhibit us from selling products to prospective customers." (Ex. 1, 2006 Annual Report at 10.) During the 2/14/07 conference call, Morgan reiterated that there are regulatory constraints "on the rate of application for digital billboards . . . and it is important that investors understand this constraint exists, to balance the picture in light of the potential growth that exists." (Ex. 7, Transcript at 2; see also Compl. ¶43.) Morgan's 2/14/07 warning is especially significant, because the projections of Daktronics' net sales and earnings per share for fiscal 2007 fourth quarter that plaintiffs complain about were publicly disclosed on the same date. Therefore, no investor can credibly claim that he was misled into thinking that the projections were without risk.

(Doc. 63, Defendants' Memorandum at 28.) The Court finds that Morgan's oral warning about the existence of regulatory constraints on digital billboard sales during the conference call on February 14, 2007, offers safe harbor protection for the projections of Daktronics' net sales and earnings per share for fourth quarter 2007 which were publicly disclosed on that date. The cautionary statement identifies the regulatory constraints as an important factor that could cause the announced projections to differ. *See* 15 U.S.C. § 78u-5(c)(2)(A). Accordingly, even if Plaintiffs had adequately alleged falsity and scienter with regard to Daktronics' projections announced on February 14, 2007, those projections qualify for safe harbor protection.

## Controlling Person Claims

Plaintiffs' Complaint fails to adequately plead the elements of their claim under Section 10(b) and will be dismissed. Plaintiffs' "controlling person" claims under Section 20(a) are derivative of their claims under Section 10(b) and they will be dismissed as well. *See Hutchinson Tech.*, 536 F.3d at 961-62.

## Amending Complaint

In the final footnote of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, Plaintiffs ask the Court for an opportunity to amend the Complaint in the event that the Court grants the motion to dismiss. To seek leave of the Court to amend the Complaint, the Local Rules of Practice in the District of South Dakota require parties to file a motion accompanied by a written brief containing legal authority in support of the motion, LR 7.2, and a copy of the proposed amended pleading with the proposed additions highlighted in bold face and the proposed deletions redlined, LR 15. 1. Accordingly, if Plaintiffs desire to file an Amended Complaint in this case, they must follow the Court rules for seeking leave to amend by filing a formal motion, and must provide a proposed amended complaint. Accordingly,

IT IS ORDERED that the Motion to Dismiss, doc. 62, is granted without prejudice to Plaintiffs' right to file a formal motion to amend the complaint within 20 days from the date of this Order.

Dated this 8th day of June, 2010.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: Summer Wahfuture
(SEAL)          DEPUTY

27